UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CESAR E. ROMERO-MANZO,<br><br>                    Petitioner,<br>    v.<br>NETHANJAH BREITENBACH,[1] et al.,<br><br>                    Respondents. | Case No. 3:22-cv-00475-ART-CLB<br><br>**MERITS ORDER**<br><br>**[ECF No. 17]** |

Petitioner Cesar R. Romero-Manzo, a Nevada prisoner who was convicted by a jury of attempted murder with the use of a deadly weapon and battery with the use of a deadly weapon, has filed a counseled Second-Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, alleging that (1) his trial counsel was ineffective and (2) there was insufficient evidence to support his conviction for attempted murder. (ECF No. 17 ("Second-Amended Petition").) Respondents answered the Second-Amended Petition, and Romero-Manzo replied. (ECF Nos. 46, 54.) For the reasons discussed below, this Court denies the Petition.

I.   **BACKGROUND**

   A.   **Factual background**[2]

Juan Orozco-Medina testified that he started dating Juliana Ruvalcaba in June 2014, a month after she broke off her 5-year relationship with Romero-Manzo. (ECF No. 21-42 at 48, 51; *see also* ECF No. 21-43 at 182–183.) In February of 2015, Ruvalcaba and Orozco-Medina were expecting a baby together, and, according to Orozco-Medina, he and Romero-Manzo had "bad blood"

---

[1] According to the Nevada Department of Corrections, Romero-Manzo is incarcerated at Lovelock Correctional Center. Nethanjah Breitenbach is the current warden for that facility. At the end of this Order, this Court kindly directs the clerk to substitute Nethanjah Breitenbach as a respondent for Respondent Timothy Garrett. *See* Fed. R. Civ. P. 25(d).

[2] This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Second-Amended Petition.

1

regarding Ruvalcaba. (ECF No. 21-42 at 52.)

On February 10, 2015, Orozco-Medina "heard a window breaking and tires screeching" outside his house, and when he looked outside, he saw Romero-Manzo get into a gray Tacoma pickup and drive away. (*Id.* at 52–55.) Orozco-Medina discovered that a rock had been thrown through the back window of his car. (*Id.* at 56.) Orozco-Medina wanted to confront Romero-Manzo and "[k]ind of" wanted to fight him. (*Id.* at 64–65.)

Orozco-Medina and his brother drove two cars from Sun Valley to Sparks, Nevada, and after arriving in Romero-Manzo's neighborhood, Orozco-Medina told his brother "to circle around the block, to make sure nobody was outside of the house." (*Id.* at 65.) Orozco-Medina, who was still driving around in his car at the time, saw the gray Tacoma, which Orozco-Medina estimated was driving "[a]pproximately 20, 25 miles an hour," right before it "rammed into [his] car." (*Id.* at 69; ECF No. 21-43 at 18.) Orozco-Medina's car "went on its side" and then "rolled off" after the gray Tacoma stopped pushing it. (ECF No. 21-42 at 70.)

Orozco-Medina saw Romero-Manzo "already outside of his truck," and Orozco-Medina, who kept two baseball bats in his car, "grabbed [a] bat [from] the back seat" and exited his car. (*Id.* at 66, 70–71.) Romero-Manzo was walking towards Orozco-Medina with his hand out, holding "a gun, wrapped in a blue bandana," and as Orozco-Medina was "kind of running towards" Romero-Manzo, Romero-Manzo said, "Fuck you." (*Id.* at 74, 77.) Then, "just as [Orozco-Medina] was about to try to hit [Romero-Manzo] with the bat, [Romero-Manzo] shot [Orozco-Medina]" in the chest from "probably four feet away." (*Id.* at 74–76.) After getting shot, Orozco-Medina dropped the bat and "tackled [Romero-Manzo] to the floor" because he was "afraid [Romero-Manzo] was going to shoot [him] again." (*Id.* at 75.) As Romero-Manzo and Orozco-Medina were wrestling for control of the gun, Orozco-Medina's brother appeared and kicked Romero-Manzo in the head. (*Id.* at 76–77.) Orozco-Medina was then able to get control of the gun and "pistol-

whipped" Romero-Manzo on the head "[a]bout 10 times." (*Id.* at 78.)

Because his car was inoperable, Orozco-Medina got into Romero-Manzo's truck and drove himself to the hospital. (ECF No. 21-43 at 37–38, 44.) The bullet, which was "lodged in the soft tissue of the lateral chest wall," did not hit any of Orozco-Medina's vital organs because it was "suspected that the rib must have deflected the bullet." (*Id.* at 128.)

Jeffrey Gullstrom witnessed the incident between Romero-Manzo and Orozco-Medina from a neighboring house. (ECF No. 21-43 at 206, 209.) According to Gullstrom, after hearing a car crash and looking out his window, he saw that "the guy [who] got out of the white truck was pointing something . . . that [he] thought was a gun, at the other guy, and they were walking towards each other." (*Id.* at 209.) After seeing what he believed to be the one man fire the gun, he saw the guy from the black car then go "after the other guy." (*Id.* at 210.) The two men then fought behind the black truck out of Gullstrom's view. (*Id.* at 211.)

### B. Procedural background

A jury found Romero-Manzo guilty of attempted murder with a deadly weapon and battery with the use of a deadly weapon. (ECF No. 22-9.) The state court sentenced Romero-Manzo to an aggregate term of 16 to 40 years in prison. (*Id.*) Romero-Manzo appealed, but the Nevada Supreme Court dismissed the appeal as untimely. (ECF No. 22-19.)

Romero-Manzo petitioned for state postconviction relief. (ECF No. 22-23.) The state court appointed counsel for Romero-Manzo, and counsel filed a supplemental petition. (ECF No. 22-45.) The state court granted the petition, concluding that Romero-Manzo "established a valid appeal-deprivation claim." (ECF No. 24-13.) In accordance with the state court's decision, Romero-Manzo appealed his judgment of conviction under NRAP 4(c).[3] (*See* ECF No. 24-42.) The

---

[3] NRAP 4(c) allows "[a]n untimely notice of appeal from a judgment of conviction

1 Nevada Court of Appeals affirmed Romero-Manzo's judgment of conviction. (*Id.*)

2 Romero-Manzo initiated this federal habeas case on or about October 26, 2022. (ECF No. 1.) This Court instructed Romero-Manzo to file an amended petition on the appropriate form and either pay the filing fee or file an *in forma pauperis* application. (ECF No. 3.) Romero-Manzo complied and moved for the appointment of counsel. (ECF Nos. 6, 8, 10.) This Court granted the motion, appointing the Federal Public Defender. (ECF Nos. 11, 14.)

Romero-Manzo filed his counseled Second-Amended Petition on May 16, 2023, alleging that his trial counsel failed to cross-examine Orozco-Medina using his prior inconsistent statements (ground 1a), his trial counsel failed to object to Detective Shawn Congdon's unqualified expert testimony regarding the gun (ground 1b), and there was insufficient evidence to support his conviction of attempted murder (ground 2). (ECF No. 17.) Respondents moved to dismiss the Second-Amended Petition. (ECF No. 27.) Romero-Manzo opposed the motion, and Respondents replied. (ECF Nos. 32, 38.) This Court denied the motion, finding that grounds 1a and 1b were technically exhausted and procedurally defaulted and deferring consideration of cause and prejudice to overcome the procedural default. (ECF No. 39.) Respondents filed their Answer to the Second-Amended Petition on September 2024, and Romero-Manzo filed his Reply on March 12, 2025. (ECF Nos. 46, 54.)

## II. GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d)[4] sets forth the standard of review generally applicable

---

and sentence" when "[a] postconviction petition for a writ of habeas corpus . . . assert[s] a viable claim that the petitioner was unlawfully deprived of the right to a timely direct appeal from a judgment of conviction and sentence."

[4] Romero-Manzo argues that 28 U.S.C. § 2254(d) is unconstitutional because it infringes on the separation of powers and the independence of the federal judiciary. (ECF No. 54 at 5.) Romero-Manzo acknowledges that the Ninth Circuit has previously rejected a constitutional challenge to 28 U.S.C. § 2254(d). *See Crater v. Galaza,* 491 F.3d 1119, 1129 (9th Cir. 2007) ("The constitutional

4

in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the first portion of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Lockyer v. Andrade*, 538 U.S. 63, 73, 75 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). And a state court decision involves an unreasonable application of Supreme Court precedent, within the second portion of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme]

---

foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute."). However, Romero-Manzo argues that *Crater* is irreconcilable with the Supreme Court's recent decision in *Loper Bright*.

In *Loper Bright v. Raimondo*, the Supreme Court overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), dealing with the deference owed to agency interpretations of ambiguous statutes. 603 U.S. 369, 378–79 (2024). While portions of the underlying reasoning in *Loper Bright* could be analogous in the AEDPA context—for example, if *Chevron* deference is contrary to the principles of federal judicial independence, then so too would AEDPA deference—Romero-Manzo fails to demonstrate that *Loper Bright* has been—or will be—extended to overturn AEDPA. Rather, at this time, *Crater* is binding circuit authority, and, given that *Crater* is not irreconcilable with *Loper Bright*, this Court rejects Romero-Manzo's constitutional challenge.

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).

### III. DISCUSSION

#### A. Ineffective Assistance of Counsel: Grounds 1a and 1b

In ground 1, Romero-Manzo alleges that he was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. (ECF No. 17 at 6.) Specifically, in ground 1a, Romero-Manzo alleges that his trial counsel failed to cross-examine Orozco-Medina using his prior inconsistent statements. (*Id.* at 7.) And in ground 1b, Romero-Manzo alleges that his trial counsel failed to object to Detective Congdon's unqualified expert testimony regarding the gun. (*Id.* at 10.)

##### 1. Procedural default

Romero-Manzo previously acknowledged that grounds 1a and 1b are unexhausted, but he contended that they are technically exhausted and that he could demonstrate cause and prejudice to overcome the procedural default pursuant to *Martinez*. (ECF No. 39 at 3.) The principal issues[5] before this Court are: (1) whether Romero-Manzo's ineffective-assistance-of-trial-counsel claim is substantial; (2) if so, whether Romero-Manzo's state post-conviction counsel was ineffective in raising this claim in the state district court; and (3) if so, whether, on the merits, Romero-Manzo was denied effective assistance of trial counsel. *See Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017). On all such issues, this Court's review is *de novo*. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

---

[5] It is not disputed (1) that a state post-conviction proceeding in the state district court was an initial-review collateral proceeding for purposes of *Martinez*, or (2) that Nevada procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding for purposes of applying the *Martinez* rule. *See generally Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

6

**2.     Standard**

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

**3.     Analysis of ground 1a—impeachment of Orozco-Medina**

At Romero-Manzo's preliminary hearing, Orozco-Medina testified that (1) after Romero-Manzo threw the rock at his car window, he "[t]ook off in [his] car . . . [t]o confront him," (2) Orozco-Medina wanted to talk to Romero-Manzo to "see if [Romero-Manzo] had a good answer for throwing [the] rock" but "was ready to fight" if "that's what it was going to be," and (3) Orozco-Medina "couldn't really tell" what was in Romero-Manzo's hand after they got out of their respective vehicles following the collision "because he had a blue bandana wrapped around it." (ECF No. 21-22 at 20, 67–69, 74.) Comparatively, during direct examination at the trial, Orozco-Medina testified that (1) he wanted to confront Romero-Manzo to see "what the problem was" and "why he threw the rock through [his] window"

7

1    but also "[k]ind of" wanted to fight him, and (2) Romero-Manzo was holding "a
2    gun, wrapped in a blue bandana" after he exited his truck following the collision.
3    (ECF No. 21-42 at 64–65, 74.) During cross examination at the trial, Romero-
4    Manzo's trial counsel had Orozco-Medina read his preliminary hearing transcript
5    and then questioned Orozco-Medina about whether he really wanted to just talk
6    to Romero-Manzo following the rock throwing incident or whether he "wanted to
7    get physical with him." (ECF No. 21-43 at 62.) Orozco-Medina clarified, "I wanted
8    to talk to him," but "I wasn't going to get my ass whipped." (*Id.*)

9        Romero-Manzo argues that his trial counsel's failure to use Orozco-
10   Medina's preliminary hearing testimony regarding his desire to fight Romero-
11   Manzo and whether he saw Romero-Manzo holding a firearm robbed him of
12   evidence that the shooting was done in self-defense. (ECF No. 17 at 10.) This
13   Court finds that Romero-Manzo fails to demonstrate deficiency or prejudice.

14       First, it is unclear how Orozco-Medina's unexpressed desire to fight
15   Romero-Manzo and ability to see the gun underneath the bandana reflect on
16   Romero-Manzo's actions. Romero-Manzo's theory at trial was that he acted in
17   self-defense when Orozco-Medina charged at him with a bat. Evidence of Orozco-
18   Medina's inclination to fight on that day and knowledge that there was a gun
19   under the bandana would not have necessarily added to this defense given that
20   Romero-Manzo was not privy to Orozco-Medina's thoughts and knowledge before
21   shooting him.

22       Second, Orozco-Medina's preliminary hearing testimony and trial
23   testimony were not irreconcilable. Orozco-Medina testified at the preliminary
24   hearing that he wanted to talk to Romero-Manzo about the throwing of the rock
25   but was ready to fight if needed, and Orozco-Medina testified at the trial that he
26   wanted to talk to Romero-Manzo but was not going to allow Romero-Manzo to
27   beat him up. These are merely two different ways of saying the same thing.
28   Orozco-Medina later testified at the preliminary hearing that he could not really

tell what was in Romero-Manzo's hand following the collision because of the bandana, and Orozco-Medina testified at the trial that Romero-Manzo was holding a gun wrapped in a bandana following the collision. While Orozco-Medina's testimony at the trial was definitive about the presence of the gun as compared to his preliminary hearing testimony, the basis for any discrepancy was in the form of the question. At the preliminary hearing Orozco-Medina was asked "[w]hat do you see in his hand," whereas at the trial he was asked "what did the defendant have in his hand." (*Compare* ECF No. 21-22 at 74 *with* ECF No. 21-42 at 74.)

In sum, Romero-Manzo fails to demonstrate any deficiency or prejudice under *Strickland* resulting from his counsel's cross-examination of Orozco-Medina, so ground 1a is not substantial. Because Romero-Manzo fails to show prejudice to overcome the procedural default, ground 1a is dismissed.

### 4. Analysis of ground 1b—expert testimony

Detective Shawn Congdon of the Sparks Police Department testified for the prosecution at Romero-Manzo's trial concerning, *inter alia*, the revolver used during the shooting. (ECF No. 21-43 at 140, 150.) The following colloquy took place during Detective Congdon's testimony:

> Q: What else do you see in [the cylinder of the gun]?
> A: Two live .22 rounds, as well as two spent casings.
> Q: Now when you were taking the gun apart, did you note, kind of within the cylinder, the order of the spent and live rounds?
>
> . . .
>
> A: The rounds in the cylinder were a live round, a spent round, a live round, a spent round, and then two empty spots in the cylinder: meaning, there was no round in either one of those.
> Q: Does that have any type of significance to you, as a law-enforcement officer?
> A: It is concerning, yes.
> Q: Why is that?
> A: It tells me that for some reason that - -
> [Defense]: This is conjecture now.
> COURT: Overruled.
> Q: Go ahead.

9

|   |   |   |
|---|---|---|
| | A: | It tells me that in order to get from a live round, to a fired round, back to a live round, that there had to be a misfire in the gun; or somebody has manipulated the gun and rotated the cylinder, so it would be on an empty casing. |
| | Q: | What do you mean by a "misfire?" |
| | A: | "Misfire" is where the hammer of the gun hits the back of the bullet, and the bullet simply does not fire, for whatever reason. |
| | Q: | So it would indicate to you that perhaps the trigger was pulled more than one time? |
| | [Defense]: | Now that's speculative. |
| | COURT: | I know. This officer can testify. He cannot provide a guess; he can provide his informed opinion. And then counsel gets to argue it to the jury, after the evidence is presented. It is overruled. You may answer the question, sir. |
| | A: | Sorry. Could you repeat that? |
| | Q: | Does that indicate to you that the gun was fired more than one time. |
| | [Defense]: | Same objection. |
| | Q: | It's the same question. |
| | COURT: | I have made my ruling, and I tell counsel to proceed. |
| | A: | Yes, that's the case. |

(*Id.* at 151–53.)

Instead of objecting to Detective Congdon's testimony as speculative, Romero-Manzo argues that his trial counsel should have objected on the basis that Detective Congdon provided unqualified expert testimony. (ECF No. 17 at 12.) This Court finds that Romero-Manzo fails to demonstrate deficiency or prejudice.

Nevada law defines an expert witness as someone having "scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Nev. Rev. Stat. § 50.275. Contrarily, a lay witness may testify to "opinions or inferences" that are "[r]ationally based on the perception of the witness; and . . . [h]elpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." Nev. Rev. Stat. § 50.265. According to Nevada law, "[t]he key to determining whether testimony about information . . . constitutes lay or expert testimony lies with a careful consideration of the substance of the testimony," namely, "does the testimony concern information within the common knowledge

1  of or capable of perception by the average layperson or does it require some
2  specialized knowledge or skill beyond the realm of everyday experience?"
3  *Burnside v. State*, 352 P.3d 627, 636 (Nev. 2015).

4  Here, Romero-Manzo fails to demonstrate that Detective Congdon's
5  testimony amounted to expert testimony under Nevada law, thus giving his trial
6  counsel any basis to object. Detective Congdon testified to the status of the six
7  chambers within the cylinder of the revolver: live casing, spent casing, live casing,
8  spent casing, and then two empty chambers. Because of this sequence, the gun
9  either had to have been fired unsuccessfully following the shooting of Orozco-
10 Medina or the cylinder had to have been manually manipulated. As such,
11 Detective Congdon's testimony merely amounted to a logical deduction and did
12 not rise to the level of "scientific, technical or other specialized knowledge" under
13 Nevada Revised Statute § 50.275. *See Burnside*, 352 P.3d at 632 (holding that
14 while "the cell phone company employee's testimony related to how cell phone
15 signals are transmitted constituted expert testimony because it required
16 specialized knowledge[,] . . . a police officer's testimony about information on a
17 map that he had created to show the location of the cell towers used by the
18 defendants' cell phones constituted lay testimony."). Because an objection to
19 Detective Congdon's alleged expert testimony under Nevada law would have been
20 overruled by the trial court, Romero-Manzo's trial counsel's failure to make such
21 an objection did not amount to ineffective assistance of counsel under *Strickland*.
22 Accordingly, ground 1b is not substantial, so Romero-Manzo fails to demonstrate
23 prejudice to overcome the procedural default. Ground 1b is dismissed.

24  **B.  Insufficient Evidence: Ground 2**

25  In ground 2, Romero-Manzo alleges that he was denied his right to a fair
26 trial and due process in violation of the Fourteenth Amendment because there
27 was insufficient evidence to support his conviction for attempted murder. (ECF
28 No. 17 at 13.) Specifically, Romero-Manzo alleges that the prosecution failed to

11

present evidence proving beyond a reasonable doubt that he had the specific intent to kill Orozco-Medina because he was merely defending himself when Orozco-Medina charged at him with a baseball bat. (*Id.*)

### 1. State court determination

In affirming Romero-Manzo's judgment of conviction, the Nevada Court of Appeals held as follows:

> Romero-Manzo argues that insufficient evidence supports his attempted murder conviction because the State failed to establish that he intended to kill the victim. We review "the evidence in the light most favorable to the prosecution" and determine whether "*any* rational [juror] could have found the essential elements of the crime beyond a reasonable doubt." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). "Intent to kill . . . may be ascertained or deduced from the facts and circumstances . . . such as use of a weapon calculated to produce death, the manner of use, and the attendant circumstances." *Sharma v. State*, 118 Nev. 648, 659, 56 P.3d 868, 874-75 (2002) (alteration and internal quotation marks omitted). It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where substantial evidence supports the verdict. *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).
> 
> The jury heard testimony that Romero-Manzo was jealous and angry because the victim was dating Romero-Manzo's ex-girlfriend, there was "bad blood" between Romero-Manzo and the victim, and Romero-Manzo threw a rock through the window of the victim's car. When the victim drove to confront Romero-Manzo about throwing the rock, Romero-Manzo crashed his vehicle into the side of the victim's vehicle, disabling it. The victim exited his vehicle with a metal bat. Romero-Manzo exited his vehicle with a gun wrapped in a blue bandana and pointed it at the victim as they walked toward each other. Romero-Manzo uttered an expletive and then shot the victim once in the chest from approximately four feet away. Based on this testimony, any rational juror could reasonably find Romero-Manzo committed attempted murder. *See* NRS 193.200 (explaining how intent is manifested); NRS 193.330(1) (defining attempt); NRS 200.010 (defining murder); NRS 200.020(1) (defining express malice); *Grant v. State*, 117 Nev. 427, 435, 24 P.3d 761, 766 (2001) ("Intent need not be proven by direct evidence but can be inferred from conduct and circumstantial evidence."). Therefore, we conclude Romero-Manzo's argument lacks merit, and we ORDER the judgment of conviction AFFIRMED.

(ECF No. 24-42 at 2–3.)

### 2. Standard

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Coleman v. Johnson*, 566 U.S. 650, 655 (2012) ("[T]he minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution," and it must be presumed "that the trier of fact resolved any . . . conflicts in favor of the prosecution." *Id.* at 319, 326. "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 4 (2011). In addition to deferring to the jury, this Court must also defer to the state court: federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of *Jackson. Coleman*, 566 U.S. at 651 ("*Jackson* claims . . . subject to two layers of judicial deference.").

Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16. Here, under Nevada law, "[a]ttempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill." *Keys v. State*, 766 P.2d 270, 273 (Nev. 1988). Intention to kill "is manifested by the circumstances connected with the perpetration of the offense." Nev. Rev. Stat. 193.200.

### 3. Analysis

The Nevada Court of Appeals reasonably applied the correct federal law—

citing *McNair v. State*, which directly follows *Jackson*—to the facts of the case in determining that a rational trier of fact could have reasonably found that Romero-Manzo committed attempted murder. Indeed, as the Nevada Court of Appeals reasonably highlighted, Romero-Manzo's actions on February 10, 2015, could be used to infer that he acted with the intent to kill.

Romero-Manzo disputes that the prosecution proved his intention beyond a reasonable doubt, casting the facts in the following beneficial light: his petty action to damage property over jealousy put him in a situation where he was being pursued and attacked by two men who had intentions to harm him. (ECF No. 54 at 35.) However, this Court presumes that the jury accepted the prosecution's version of the facts: Romero-Manzo was feuding with Orozco-Medina over Ruvalcaba, Romero-Manzo drove his truck into Orozco-Medina's truck to immobilize him while Orozco-Medina's brother was not around, Romero-Manzo brought a deadly weapon to confront Orozco-Medina, Romero-Manzo was already pointing the gun at Orozco-Medina when Orozco-Medina got out of his car with the bat, and Romero-Manzo shot Orozco-Medina in the chest from a short distance. Given that (1) the jury has broad discretion to decide what inferences to draw from Romero-Manzo's conduct under the prosecution's version of the facts as it relates to his intent, and (2) intent to kill may be inferred from the circumstances surrounding the crime, Romero-Manzo fails to demonstrate that the Nevada Court of Appeals was objectively unreasonable in concluding that the jury rationally found beyond a reasonable doubt that Romero-Manzo acted with an intent to kill.

Romero-Manzo also rebuts the prosecution's following closing argument comments: (1) shooting Orozco-Medina in the chest, as opposed to a different part of the body, was merely a result of the lack of time he had to aim the gun rather than due to his intent to kill, (2) saying "[f]uck you" to Orozco-Medina before shooting him was merely an obscenity shouted in the heat of the moment

rather than an indication of his intent to physically harm Orozco-Medina, and (3) the wrapping of the gun in the blue bandana was meaningless, since the gun could have been wrapped in the blue bandana beforehand, rather than an indication that he was surreptitiously planning to shoot Orozco-Medina. (ECF No. 17 at 14–16.) These arguments are just that: arguments. The debate over the meaning behind the location of the shooting on Orozco-Medina, the use of an expletive, and the blue bandana was for the jury to decide. Accordingly, these arguments fail to rise to the level of demonstrating that the jury's finding of an intent to kill was so unsupportable as to fall below the threshold of rationality.

Thus, the Nevada Court of Appeals' denial of relief on this claim during Romero-Manzo's direct appeal proceedings was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Romero-Manzo is not entitled to federal habeas relief for ground 2.

## IV.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Romero-Manzo. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability. This Court has *sua sponte* evaluated the claims within the Second-Amended Petition for suitability for the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists could debate (1) whether the petition states a valid claim of

the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.* Applying these standards, this Court finds that a Certificate of Appealability is unwarranted.[6]

## V. CONCLUSION

It is therefore ordered that the Second-Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 [ECF No. 17] is denied.

It is further ordered that a Certificate of Appealability is denied.

It is further kindly ordered that the Clerk of the Court (1) substitute Nethanjah Breitenbach for Respondent Timothy Garrett, (2) enter judgment, and (3) close this case.

DATED THIS 10th day of September 2025.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

---

[6] Romero-Manzo generally requests that this Court "[c]onduct an evidentiary hearing at which proof may be offered concerning the allegations in" his Second-Amended Petition. (ECF No. 17 at 16.) This Court denies Romero-Manzo's request. First, Romero-Manzo does not explain what evidence would be presented at an evidentiary hearing. Second, regarding ground 2, this Court has already determined that *de novo* review is unwarranted, so supplementing the record for this ground is prohibited. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). And third, this Court has already determined that Romero-Manzo is not entitled to relief and further factual development would not affect this Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").